IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

MATTHEW CANTERBURY,

       Plaintiff,

v.                                        Case No. 3:18-cv-01530

BRITTANY ADKINS;
CAPTAIN ALDRADGE;
ADMINISTRATOR WOOD;
CORPORAL AKERS; and,
SERGEANT DIAMOND,

       Defendants.


**PROPOSED FINDINGS AND RECOMMENDATIONS**

Plaintiff, Matthew Canterbury, (hereinafter "Plaintiff"), proceeding *pro se* has filed suit pursuant to 42 U.S.C. § 1983 for alleged violations of his civil rights that occurred while he was incarcerated at the Western Regional Jail and Correctional Facility ("WRJ") in Barboursville, West Virginia. (ECF No. 2). This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and by standing order has been referred to the undersigned United States Magistrate Judge for total pretrial management and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3). Currently pending is a Motion for Summary Judgment filed by Defendant, Brittany Adkins ("Adkins"). (ECF No. 22).

For the reasons that follow, the undersigned **FINDS** that Defendant's Motion for Summary Judgment, (ECF No. 22), should be **GRANTED**; that the complaint against

Adkins, (ECF No. 2), should be **DISMISSED** with prejudice, and that this Defendant should be **REMOVED** from the style of the civil action.

## I.    Relevant History

### A. Procedural History

On November 26, 2018, Plaintiff filed a complaint alleging violations of the Eighth Amendment to the United States Constitution ("Eighth Amendment") related to an assault he allegedly suffered while incarcerated at the WRJ. (ECF No. 2 at 7). Plaintiff asserts that, on September 23, 2018, Adkins, who was a correctional officer at the WRJ, assaulted Plaintiff and then attempted to provoke him into retaliating by calling him a "pussy," and telling him to hit her back. (*Id*. at 4). Plaintiff claims that Adkins attempted to strike him again, but he stopped her by grabbing her fist and shoulder to prevent the attack.

Plaintiff states that, following the incident, he was punished and placed in administrative segregation where prison staff members directed other inmates to throw feces and urine at Plaintiff. (*Id*. at 4-5). Plaintiff contends that prison staff further violated his rights by improperly holding him in administrative segregation, taking his property, and refusing to give him his glasses in order to prevent Plaintiff from signing a statement regarding the incident with Adkins. (*Id*. at 5). Plaintiff asks that the WRJ be enjoined to cease permitting staff to act with impunity, that it be ordered to comply with its own policies, and that several individuals, including Adkins, be reprimanded or fired. (*Id*.). Plaintiff also seeks monetary damages. (*Id*.). He sues a number of prison staff members, including the Administrator of the WRJ.

On May 13, 2019, Adkins filed a Motion for Summary Judgment with attached exhibits, accompanied by a Supporting Memorandum of Law. (ECF Nos. 22, 22-1. 22-2.

22-3, 22-4, 23). Adkins additionally submitted a digital versatile disk (hereinafter referred to as "the videotape"), which purportedly contains surveillance footage of the events of September 23, 2018 that are the subject of Plaintiff's complaint. (ECF No. 25).

Adkins asserts that the videotape in question conclusively contradicts Plaintiff's version of events and that she is entitled to summary judgment. (ECF No. 23 at 5). Adkins additionally argues that Plaintiff failed to properly exhaust his claims as required by statute. (*Id.* at 5). Adkins contends that Plaintiff's failure to exhaust his administrative remedies is uncontested and, as such, offers an independent basis for her dismissal from the lawsuit. (*Id.* at 8). On May 14, 2019, the undersigned entered an Order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), notifying Plaintiff that he had the right and obligation to respond to Adkins's motion for summary judgment. (ECF No. 24). Plaintiff was warned that a failure to respond to the motion could result in a recommendation that summary judgment for the Defendant be entered. (*Id.*).

On June 26, 2019, the undersigned held a status conference regarding discovery timelines and the pending motion for summary judgment filed by Defendant Adkins. (ECF No. 30). During the status conference, the undersigned alerted Plaintiff to the pending motion for summary judgment and informed him that it was necessary for him to provide a response if he disputed its claims. At that time, Plaintiff provided further details regarding the incident with Adkins, explaining that he had become upset with Adkins when she instructed him to put on a shirt before receiving his medications, although other inmates were shirtless. Plaintiff explained that he and Adkins argued over this perceived disparate treatment, and during the course of the argument, Adkins struck him. Adkins subsequently attempted to strike him again, so Plaintiff grabbed Adkins's arm in an effort to protect himself, causing a struggle to ensue. Plaintiff claimed

to suffer from a persistent ringing in his ear due to the blow by Adkins.

When the undersigned inquired if Plaintiff had attempted to file a grievance regarding the incident and his reported subsequent mistreatment by prison staff, Plaintiff stated that he did not because he believed it would be a futile endeavor to file a grievance as it was unlikely to receive a response. The undersigned again reminded Plaintiff of his responsibility to respond to the motion for summary judgment. On June 27, 2019, the undersigned issued an Order setting various deadlines for discovery, as well as instructing Plaintiff to file a response to the motion for summary judgment by July 17, 2019. (ECF No. 31). Plaintiff never filed a response to Adkins's motion for summary judgment, and has not submitted any filing in this case since the submission of his complaint in November 2018.

### B. Supporting Evidence Submitted by Adkins

Adkins submitted a number of items of evidence in support of her dispositive motion. The piece of evidence fundamental to Adkins's request for summary judgment is the videotape, which consists of footage taken by surveillance cameras at the WRJ capturing the encounter between Plaintiff and Adkins. Plaintiff has not disputed the accuracy or authenticity of the videotape.

The videotape begins at 9:57:00 a.m. and includes three frames. The frames show a pod with a dayroom and two tiers of cells. A metal staircase at one side of the cells leads up to a metal walkway running in front of the second tier of cells, which overlook the dayroom. In the corner of the dayroom, at the bottom of the stairs, is a windowed door to a hallway outside of the pod. On the other side of the window, in the hallway, a medical dispensary cart has been stationed, behind which a jail staff member is located to dispense medications to the inmates through the window. Inmates are standing in line

in front of the window, waiting for medications. A square section of the floor around the window, on the pod side, is marked by a border of red paint or tape, indicating where the inmate receiving medication should stand.

At the beginning of the videotape, Adkins is partially visible and is seen standing in the corner of the red square near the dispensary window, with her back against the wall, observing the inmates as they collect their medications. Several inmates are in line waiting their turn, while Plaintiff sits shirtless at a table in the dayroom area. At 9:57:09, he gets up and enters cell door 2.[1] He exits the cell with a shirt and walks back over to the medication dispensary area while putting the shirt on. At approximately 9:58:00, instead of going to the end of the line, Plaintiff walks between two inmates, one waiting in line and one receiving medication, enters the red-bordered square, approaches Adkins, and begins speaking, while standing extremely closely to her. Adkins is only partially visible due to her location in the corner of the room. However, in one frame, it appears that Adkins is making a clucking gesture with one hand, indicating that Plaintiff is "running his mouth." Plaintiff appears to speak to Adkins in an excited manner, causing the inmate receiving his medication to turn around and watch the two interact. At 9:58:04, Plaintiff draws back his right arm and moves it swiftly forward toward Adkins's head. Due to the position and quality of the view afforded by the surveillance cameras, whether Plaintiff makes contact with Adkins cannot be conclusively determined; however, at the very least, he comes extremely close to hitting her. Adkins quickly responds to this movement by striking Plaintiff on the left side of his face.

---

[1] The timestamps reflected on the various frames are not perfectly synchronized and, while they depict the same events, the time reflected on the frames has slight variations. The timestamps referenced herein refer to those depicted on the section 7-high frame which affords the best view of the events.

Plaintiff continues speaking to Adkins for a few seconds, then steps back and away from the area.

However, a few seconds later, Plaintiff again approaches Adkins, striding in front of the inmate next in line for medication. Plaintiff appears to engage Adkins in an argument while simultaneously requesting his medication through the dispensary window. Plaintiff gesticulates and continues to speak to Adkins as his medication is being prepared. At 9:58:49, after being handed his medication, Plaintiff suddenly turns and lunges toward Adkins, grabbing her by the arm. The two struggle for several seconds until two inmates intervene and restrain Plaintiff near the stairs. Plaintiff is released by the inmate restraining him at 10:00:21 when a second correctional officer appears on the scene. Plaintiff returns to the medication dispensary area and takes his medication. Following the arrival of a number of other correctional officers, Plaintiff is escorted offscreen at 10:00:44. The videotape ends at 10:01:17.

The other items of evidence submitted by Adkins include Plaintiff's Plea Order entered in the Circuit Court of Wayne County, West Virginia, which proves that Plaintiff was a convicted felon at the time of the altercation with Adkins and his convictions stemmed from charges of Second Offense Battery on a Government Representative, (ECF no. 22-1 at 2-3); a copy of the Inmate Grievance Procedure in place at the WRJ during the relevant time period, (ECF No. 22-2); and a portion of the transcript of Plaintiff's deposition in which he confirms that he did not file a grievance related to the events that form the basis of his complaint. (ECF Nos. 22-3 at 3-4).

The final piece of evidence submitted by Adkins is a "Workflow Interaction" document which records communications to prison staff submitted by Plaintiff during the relevant time period. (ECF No. 22-4). The document reveals that Plaintiff submitted

an emergency request for a haircut on August 9, 2018. (*Id.* at 1). On August 10, 2018, Plaintiff was informed by prison staff that his haircut request was "not an emergency," and that he was scheduled to receive a haircut. (*Id.*). On October 31, 2018, Plaintiff submitted an Inquiry in which he stated he would "like to be added to barbers list." (*Id.* at 2). Plaintiff was informed he was already on a list to receive a haircut. (*Id.*). Plaintiff submitted a Grievance on November 25, 2018 in which he stated that "the new lockdown time at 10 will not work a lot of people won[']t get out especially on 2[-]man days." (*Id.* at 4). Superintendent Wood replied to the Grievance on November 26, 2018, informing Plaintiff that, as an A-5 segregation inmate, he was not authorized to receive "dayroom time." (*Id.*). Plaintiff was further informed that he would remain in administrative segregation until he was no longer "considered a threat to the staff in this Jail." (*Id.*). Plaintiff additionally submitted an Inquiry on December 9, 2018, requesting assistance with preparing legal documents. On December 10, 2018, his request was granted. (*Id.* at 3). Plaintiff does not dispute the accuracy or authenticity of any of the documents submitted by Adkins.

## II.   <u>Standard of Review</u>

Adkins moves for summary judgment under Federal Rule of Civil Procedure 56(a). (ECF No. 22). Summary judgment is proper under Rule 56 when no genuine issue of material fact is in dispute, and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and a disputed issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. The party moving for summary judgment bears the initial burden of showing "that there is an absence of

evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

If the moving party meets this burden, then the burden shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322, n.3. The nonmoving party must do more than rely upon the allegations or the denial of allegations contained in his pleadings to defeat a motion for summary judgment; instead, he must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Concrete evidence includes "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The court must not resolve disputed facts, nor weigh the evidence. *Russell v. Microdyne Corp.,* 65 F.3d 1229, 1239 (4th Cir. 1995). Instead, the court must accept as true the facts asserted by the nonmoving party and review the evidence "draw[ing] all justifiable inferences" in its favor. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520 (1991).

Even still, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano,* 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). Thus, while any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co,* 475 U.S. at 587, "[i]f the evidence is merely colorable, or is

8

not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249-50).

**III.    Relevant Law**

### A. *Eighth Amendment to the United States Constitution*

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment" to the United States Constitution. *Farmer v. Brennan,* 511 U.S. 825, 833 (1994) (internal citations omitted). The use of excessive force against an inmate by a correctional officer plainly violates the Eighth Amendment's cruel and unusual punishment clause, *Wilkins v. Gaddy,* 559 U.S. 34 (2010), and is cognizable under 42 U.S.C. § 1983. To establish a constitutional claim of excessive force against Adkins, Plaintiff must show that she "inflicted unnecessary and wanton pain and suffering." *Taylor v. McDuffie,* 155 F.3d 479, 483 (4th Cir.1998) (quoting *Whitley v. Albers,* 475 U.S. 312, 320 (1986)). This claim contains both an objective and a subjective component.

To satisfy the objective component, Plaintiff must demonstrate that the force applied by Adkins was "sufficiently serious." *Williams v. Benjamin,* 77 F.3d 756, 761 (4th Cir. 1996). "This is not a high bar, requiring only something more than '*de minimus*' force" *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019) (quoting *Hudson v. McMillian,* 503 U.S. 1, 10 (1992)). While "mere threats or verbal abuse, without more, do not state a cognizable claim under § 1983," *Wilson v. McKeller,* 254 F.App'x 960, 961 (4th Cir. 2007) (citing *Northington v. Jackson,* 973 F.2d 1518, 1524 (10th Cir. 1992)), "'nontrivial force'" is sufficient to state a claim under the Eighth Amendment. *Brooks,* 924 F.3d at 112 (quoting *Wilkins,* 559 U.S. at 39).

With respect to the subjective element of an excessive force claim, Plaintiff must show that Adkins "acted with a sufficiently culpable state of mind." *Williams,* 77 F.3d at 761. This is a "demanding standard," because the "state of mind required ... is wantonness in the infliction of pain." *Brooks,* 924 F.3d at 112. When a prison official "maliciously and sadistically use[s] force to cause harm, contemporary standards of decency always are violated whether or not significant injury is evident." *Wilkins,* 559 U.S. at 37 (explaining that the "core judicial inquiry" is whether the force "was applied ... maliciously and sadistically to cause harm.") (quoting *Hudson,* 503 U.S. at 7). Prison officials act with "a permissible motive—not only when they confront immediate risks to physical safety, but also when they attempt to preserve internal order by compelling compliance with prison rules and procedures." *Brooks,* 924 F.3d at 113 (citation and internal markings omitted). "But corrections officers cross the line into impermissible motive—using force maliciously and for the very purpose of causing harm—when they inflict pain not to induce compliance, but to punish an inmate for intransigence or to retaliate for insubordination." *Id.* (internal citations and markings omitted).

When considering an excessive force claim, the court must ask if "the force applied was in a good faith effort to maintain or restore discipline" or was simply for the purpose of causing injury. *Taylor,* 155 F.3d at 483 To make this determination, the court should examine the following factors: "(1) the need for the application of force; (2) the relationship between the need and the amount of force used: (3) the extent of the injury inflicted; and (4) the extent of the threat to the safety of staff and inmates as reasonably perceived by the responsible officials on the basis of the facts known to them." *Chisolm v. Assoc. Warden Thompson*, No. 4:15-CV-01806-RBH, 2016 WL 4394276, at *7 (D.S.C. Aug. 18, 2016) (quoting *Whitley*, 475 U.S. at 321). "While excessive force does require

malicious intent, it does not require that the prisoner victim suffer a 'significant injury.' … [A] prisoner who suffers a minor, but malicious, injury may be able to prevail on an excessive force claim." *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 98 (4th Cir. 2017).

Nevertheless, the lack of serious injury is not irrelevant to the Eighth Amendment inquiry. *Hudson*, 503 U.S. at 7 ("The absence of serious injury is … relevant to the Eighth Amendment inquiry, but does not end it."). The extent of the injury provides some indication as to the amount of force applied. *Wilkins*, 559 U.S. at 37. "[N]ot 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Id.* (quoting *Hudson*, 503 U.S. at 9). "An inmate who complains of a push or a shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Hudson*, 503 U.S. at 9; *see also Jackson v. Holley*, 666 F. App'x 242, 244 (4th Cir. 2016).

### B.  The Prison Litigation Reform Act

The Prison Litigation Reform Act ("PLRA") requires inmates to exhaust administrative remedies prior to filing a complaint in federal court. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). "Once within the discretion of the district court, exhaustion in cases covered by § 1997e(a) is now mandatory. All available remedies must now be exhausted; those remedies need not meet federal standards, nor must they be plain, speedy, and effective. Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Porter v. Nussle,* 534 U.S. 516, 524 (2002) (citations and internal quotation marks omitted)).

In *Ross v. Blake,* 136 S. Ct. 1850, 1858 (2016), the Supreme Court of the United States ("Supreme Court") reiterated the mandatory exhaustion requirement found in § 1997e, but pointed out that the statute contains one explicit exception; the inmate need not exhaust "unavailable" remedies. *Id.* The Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide relief to aggrieved inmates." *Id.* Second, an administrative process is likewise unavailable when it is "so opaque" that "no ordinary prisoner can discern or navigate it." *Id.* Finally, an inmate need not exhaust administrative remedies when prison officials thwart the inmate's access to the grievance procedure "through machination, misrepresentation, or intimidation." *Id.* at 1860. "[S]uch interference with an inmate's pursuit of relief renders the administrative process unavailable." *Id.*

Administrative exhaustion is "not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner." *Hart v. Roderick,* No. CV GLR-15-2054, 2016 WL 3940219, at *3 (D. Md. July 21, 2016) (citations omitted). As such, exhaustion need not be alleged by the plaintiff in his complaint, but is instead "an affirmative defense that should be pleaded or otherwise properly raised by the defendant." *Anderson v. XYZ Correctional Health Services, Inc.,* 407 F.3d 674, 681 (4th Cir. 2005). Although exhaustion is an affirmative defense, this "does not foreclose in all cases the possibility of a *sua sponte* dismissal on exhaustion grounds." *Id.* In the rare instance when the face of a complaint clearly demonstrates a prisoner's failure to exhaust administrative remedies, *sua sponte* dismissal on that ground is appropriate.

12

*Anderson*, 407 F.3d at 682 (citing *Nasim v. Warden,* 64 F.3d 951 (4th Cir. 1995)). When exhaustion is not clear on the face of the complaint, a district court may still *sua sponte* raise that affirmative defense, but may not dismiss the complaint on that ground without first giving the plaintiff an opportunity to respond. *Id.* at 682-83.

## IV.    Discussion

Plaintiff brings this complaint pursuant to 42 U.S.C. § 1983. Title 42 U.S.C. § 1983 provides a remedy to parties who are deprived of federally protected civil and constitutional rights by persons acting under color of any state "law, statute, ordinance, regulation, custom, or usage." *Id.* Congress enacted § 1983 "to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." *Monroe v. Pape,* 365 U.S. 167, 171-172 (1961), *overruled on other grounds by Monell v. Dept. of Soc. Servs.,* 436 U.S. 658 (1978).

In order to state a cause of action under § 1983, a plaintiff must present facts showing that: (1) a person deprived him or her of a federally protected civil right, privilege or immunity and (2) that the person did so under color of State law. *Perrin v. Nicholson*, C/A No. 9:10-1111-HFF-BM, 2010 WL 3893792, at *2 (D.S.C. Sept. 8, 2010); *See American Mfr. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999) ("To state a claim for relief in an action brought under § 1983, respondents must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law."). If either of these elements is missing, the complaint fails to state a claim for relief under § 1983. *Id.* at 50.

### A.  *Failure to Exhaust Administrative Remedies*

For West Virginia state inmates, exhaustion of administrative remedies for claims

involving the general conditions of confinement—such as claims of excessive force—requires a final decision from "the Commissioner of Corrections or the Commissioner's designee, or the Executive Director of the Regional Jail Authority, or the Director's designee." W. Va. Code § 25-1A-2.[2] The following grievance procedure governed inmates housed at West Virginia regional jails:

> [I]inmates must first submit a grievance to the Administrator of the facility in which they are confined. Upon receipt of the grievance, the Administrator may reject the grievance if it appears on its face to have been filed in bad faith, or if other administrative procedures exist that have not been utilized. If the grievance is rejected, the Administrator must advise the inmate of the rejection. If the grievance is not rejected, the Administrator may assign a staff member to investigate the complaint. Such staff is then required to submit a written report within forty-eight (48) hours. Within two days of receipt of the written report, the Administrator must provide a written decision which identifies the action taken, the reasons for the action, and the procedures that must be followed to properly appeal the decision. If the Administrator's response is unfavorable, the inmate may appeal to the Chief of Operation within five days of the receipt of the Administrator's decision. Upon receipt of an appeal, the Chief of Operations must immediately direct the Administrator to forward copies of all information relating to the inmate's grievance within two business days. The Chief of Operations may direct an investigation of the report be conducted and a written report be submitted within 15 days. Within 10 days of receiving all of the information related to the grievance, the Chief of Operations must provide a written decision which identifies the corrective action taken or the reasons for denying the grievance. If the Chief of Operations' response is unfavorable, the inmate may appeal to the Office of the Executive Director within five days of receipt of the Chief of Operations' response. To do so, the inmate must mail to the Executive Director, copies of the original complaint and all of the responses thereto. The Office of the Executive Director must respond to an inmate's appeal within 10 days of receiving all the information. Unless the inmate has been notified of an extension of time for a response,

---

[2] In July 2018, the newly created West Virginia Division of Corrections and Rehabilitation ("DCR") assumed control of all of the jails and correctional facilities in the State of West Virginia, which previously were managed by either the West Virginia Division of Corrections, or the West Virginia Regional Jail and Correctional Facility Authority. The Division of Corrections and the Jail Authority each had its own grievance procedure. While Adkins suggests in her motion, (ECF No. 22-2), that Plaintiff was subjected to the exhaustion process created by the Jail Authority, the DCR has not provided clear guidance to the public regarding which of the two grievance procedures currently governs DCR inmates, or if the two distinct procedures remain in effect and apply based on where the inmate is housed. However, for the purpose of resolving the exhaustion issue in this case, it matters not, as Plaintiff did not fulfill the requirements of either grievance procedure.

the inmate may move to the next stage of the grievance process if the inmate does not receive a response at the expiration of the time limit at any stage of the process. The grievance process must be concluded within 60 days, inclusive of any extensions.

*See Green v. Trinity Food Serv.*, No. 3:19-CV-128, 2019 WL 4281921, at *2 (N.D.W. Va. Aug. 12, 2019), *report and recommendation adopted,* No. 3:19-CV-128, 2019 WL 4280050 (N.D.W. Va. Sept. 10, 2019). Inmates housed in a state correctional facility followed a similar three-level grievance procedure, set forth in Policy Directive 335.00. *See* W. Va. Code St. R. § 90-1-1, § 90-1-2. At the first step of that process, the inmate was required to submit a completed written grievance form to his or her Unit Manager within fifteen days of the occurrence that caused the inmate to file the grievance. If the grievance was rejected, denied, or the inmate did not receive a response within five days, the inmate could appeal to the Warden/Administrator within five days of delivery of the response or the date that the response was due. The inmate could then appeal the issue to the Commissioner of the Division of Corrections within five days after the inmate received the Warden/Administrator's response or the date for the response has passed. Policy Directive 335.00 is clear that "[i]f a grievance has not been properly submitted through any level by an inmate, it shall be rejected." Further, a "rejected grievance *does not exhaust the grievance process or that step of the process.*" Policy Directive 335.00 (emphasis added).

The purpose of the exhaustion requirement is twofold: first, "exhaustion protects administrative agency authority" by giving an agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court … and it discourages disregard of the agency's procedures;" second, "exhaustion promotes efficiency," as claims "generally can be resolved much more quickly and

economically in proceedings before an agency than in litigation in federal court" and sometimes "claims are settled at the administrative level, and in others, the proceedings before the agency convince the losing party not to pursue the matter in federal court." *Woodford v. Ngo*, 548 U.S. 81, 89, (2006) (citations and internal quotation marks omitted). Further, "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Id.*

In this case, Plaintiff has admittedly not completed the grievance procedures available to him. Plaintiff did not respond to Adkins's motion for summary judgment in which she asserted that the complaint should be dismissed due to Plaintiff's failure to exhaust his administrative remedies. Plaintiff additionally admitted at the status conference that he did not file any grievance related to the complaint, saying that he was required to submit grievance requests through a kiosk which he would not do because he only used the kiosk to place commissary orders. Plaintiff did not clearly explain how the use of the kiosk deterred him from filing a grievance, but did indicate it was based on a belief that doing so would not result in a reply. Plaintiff additionally confirmed in his deposition that he had not submitted any grievances related to this complaint. (ECF No. 22-3 at 3). Plaintiff explained that he did not file a grievance because "[i]t would do no good for me to file a grievance at the Western Regional Jail." (*Id.*). Finally, in his complaint, Plaintiff indicated that he did not utilize a grievance procedure available at the WRJ. (ECF No. 2 at 3). In the portion of the form that asked why he did not avail himself of this remedy, Plaintiff stated "I was placed on two-man and they fail to follow their own policy to let me out every 72 hrs." (*Id.*).

To the extent that Plaintiff's various explanations regarding why he did not file a

grievance should be construed as an argument that he was not required to file a grievance because it was likely to be denied, this Court has previously considered and rejected similar claims. *See Kanode v. Rubenstein*, No. CV 1:12-6068, 2015 WL 7731395, at *3 (S.D.W. Va. Oct. 30, 2015), *report and recommendation adopted*, No. CV 1:12-06068, 2015 WL 7736643 (S.D.W. Va. Nov. 30, 2015); *Steerman v. Moats*, No. CV 1:13-2769, 2015 WL 8489031, at *3 (S.D.W. Va. Nov. 12, 2015), *report and recommendation adopted*, No. CV 1:13-02769, 2015 WL 8492759 (S.D.W. Va. Dec. 10, 2015). Even if the prison proved unresponsive to a grievance filed by Plaintiff, the "[f]ailure to receive a response is not an excuse for not moving to the next level of the grievance procedure." *Nally v. King*, No. 3:12CV128, 2013 WL 594709, at *3 (N.D.W. Va. Jan. 3, 2013), *report and recommendation adopted*, No. 3:12-CV-128, 2013 WL 593448 (N.D.W. Va. Feb. 15, 2013); *see also Hinkle v. Greene*, No. 5:10-CV-01086, 2013 WL 3821460, at *4 (S.D.W. Va. July 23, 2013). Here, Plaintiff admittedly filed no grievance with respect to the claims raised in this complaint. His belief that doing so would be unlikely to result in a favorable outcome does not provide a sufficient reason to excuse his failure to exhaust.

To the extent that Plaintiff's various stated reasons for not completing the administrative remedial process in place at the WRJ should be construed as an argument that the process was effectively unavailable, this argument too is unavailing. The Supreme Court has recognized that if a prison's remedial process is not effectively "available," an inmate's failure to exhaust may be excused. *Ross,* 136 S. Ct. at, 1858-59. Plaintiff stated in his complaint that he did not file a complaint because he was "placed on two-man," the prison did not follow its own policies, and would not let him out every 72 hours. Plaintiff failed, however, to explain why this operated to prevent him from filing a grievance. (ECF No. 2 at 3). In later representations, Plaintiff asserted that he

did not file a grievance, not because he was unable to, but because he believed it would serve no purpose. (ECF No. 22-3 at 4).

Any argument by Plaintiff that his placement in administrative segregation prevented him from filing a grievance is belied by his history of communications with jail staff. During the relevant time period, Plaintiff submitted several inquiries and requests, including a grievance related to a separate matter. (ECF No. 22-4 at 2-4). Prison staff did not prove unresponsive to these communications. (*Id.*). The fact that Plaintiff did in fact file a grievance which received a response during the time he was in administrative segregation refutes any assertion he might make that the grievance process was unavailable to him during this time. (*Id.* at 4). Plaintiff was additionally able to file the complaint with this Court, demonstrating that he was not unable to access documents or legal materials. Plaintiff was given the opportunity to respond to Adkins's contention that he had failed to properly exhaust his available administrative remedies and failed to do so. Accordingly, as the record clearly reveals that the grievance procedure was not unavailable to Plaintiff, to the extent he attempts to claim otherwise, this argument is unavailing.

As the record conclusively reveals Plaintiff did not exhaust his administrative remedies in accordance with the mandates of the PLRA, and that this failure is not subject to an exception to the general exhaustion requirements, the undersigned **FINDS** that Adkins's motion for summary judgment should be granted on this ground.

### B. Merits

Even if Plaintiff's claims against Adkins were not subject to dismissal for his failure to properly exhaust the claims, his complaint against this Defendant would still be subject to dismissal as he is unable to succeed as a matter of law. As an initial matter,

Plaintiff never responded to Adkins's motion for summary judgment despite receiving a *Roseboro* notice following Adkins's submission. (ECF No. 24). Additionally, at the status conference the undersigned repeatedly informed Plaintiff that he needed to respond to Adkins's motion if he wished to dispute her claims. Plaintiff acknowledged that he understood and would respond to the motion, but failed to ever file a response.

Although Plaintiff did not respond to the motion for summary judgment, he did submit a verified complaint in which he declared, under penalty of perjury, that the information contained in his complaint was true and correct. (ECF No. 2 at 7). Plaintiff's verified complaint should be treated as "'the equivalent of an opposing affidavit for summary judgment purposes.'" *Greene v. Feaster*, 733 F. App'x 80, 81 (4th Cir. 2018) (quoting *World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 516 (4th Cir. 2015)). Accordingly, where the facts stated in Plaintiff's complaint differ from those asserted in Adkins's motion for summary judgment, these facts should be construed as contested for the purposes of the motion to dismiss. *See Humple v. Hilewitz,* No. 2:13-CV-14618, 2016 WL 1117600, at *2 (S.D.W. Va. Mar. 22, 2016); *see also Washington v. Lambert*, No. 3:12-CV-292-RJC, 2014 WL 4667078, at *5 (W.D.N.C. Sept. 18, 2014).

Plaintiff's version of events does differ from those presented by Adkins. Plaintiff asserts in his complaint that he was "assaulted" by Adkins. (ECF No. 2 at 4). He states that she struck him and then taunted him and attempted to provoke him into hitting her. (*Id.*). When Adkins attempted to strike Plaintiff again, he grabbed her fist to stop her. (*Id.*). Adkins, by contrast, asserts that it is clear that Plaintiff was the aggressor and that no assault on him occurred. (ECF No. 23 at 4).

While the facts surrounding the altercation are accordingly in dispute, Adkins

submitted a videotape of the incident, which she contends blatantly contradicts Plaintiff's version of events. (*Id.*). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Plaintiff has not challenged the authenticity of the videotape, nor suggested it does not accurately depict the incident in question. The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has held that when "the record contains an unchallenged videotape capturing the events in question, [the court] must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape." *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008); *also Love v. Beasley,* ___F. App'x ___, 2020 WL 57880, at *2 (4th Cir. Jan. 6, 2020) (holding that the district court is not required to view the facts in the light most favorable to the nonmoving party when that party's "version of events is so utterly discredited by the [videotaped] record that no reasonable jury could have believed him.") (quoting *Scott,* 550 U.S. at 380).

The Fourth Circuit has clarified that the deviation from the general rule of summary judgment announced by the Supreme Court in *Scott*, which allows a district court to resolve a factual dispute in favor of the moving party where the record is unequivocal, is "the exception, not the rule." *Harris v. Pittman*, 927 F.3d 266, 276 (4th Cir. 2019). The holding "does not 'abrogate the proper summary judgment analysis, which ... usually means adopting ... the plaintiff's version of the facts.'" *Id.* (quoting *Witt v. W. Va. State Police, Troop* 2, 633 F.3d 272, 276 (4th Cir. 2011)). Accordingly, courts should not "reject a plaintiff's account on summary judgment whenever documentary evidence, such as a video, offers *some* support for a governmental officer's version of

events." *Witt*, 633 F.3d at 276. Rather, it is only when video evidence "'blatantly contradict[s]' a plaintiff's account," that a district court should adopt the moving party's version of events. *Id.* at 276-77 (quoting *Scott*, 550 U.S. at 380).

With this relevant legal precedent in mind, the undersigned will now turn to Adkins's argument that she is entitled to summary judgment based on the unchallenged videotape evidence.

### 1. Objective component

As noted above, a plaintiff attempting to present a claim based on an allegation of excessive force employed in violation of the Eighth Amendment's proscription against cruel and unusual punishment must establish both an objective and subjective component. *Brooks*, 924 F.3d at 112. The objective component, requiring a showing that the force employed was "sufficiently serious to establish a cause of action" is "not a high bar, requiring only something more than '*de minimis*' force." *Id.* (quoting *Hudson*, 503 U.S. at 10).

Plaintiff in his complaint alleges that he was "assaulted" by Adkins. (ECF No. 2 at 4). Plaintiff asserts that Adkins "hit me" and then attempted to provoke him into striking her. When she later attempted to hit him again, Plaintiff grabbed her fist and shoulder to stop her from striking him a second time. (*Id.*). Plaintiff does not describe with specificity the force he believes was improperly deployed, or detail any injuries he suffered, but does assert generally that he is owed compensation for "the pain and suffering I have had." (*Id.* at 5). At the status conference, Plaintiff made clear that the use of force he objected to was the initial blow delivered by Adkins which struck him in the head, and which he contends was unprovoked and unjustified. He also stated that since the blow, he has experienced ringing in his ears.

The videotape does reveal that Adkins delivered a single hit to the left side of Plaintiff's face. The Supreme Court has stated that "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Wilkins*, 559 U.S. at 37 (quoting *Hudson,* 503 U.S. at 9). Accordingly, a prisoner "who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Id.* at 38 (quotation omitted). However, in *Wilkins*, the Supreme Court also admonished against conflating an analysis of *de minimis* injury with that of a *de minimis* application of *force,* holding that "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.*

Courts have reached differing conclusions regarding whether a single punch, slap, or other offensive blow can be a sufficiently serious application of force to meet the objective component of an Eighth Amendment claim. *Compare Atkins v. Glaser*, No. 1:18CV354 (LMB/TCB), 2019 WL 459021, at *3 (E.D. Va. Feb. 5, 2019) (single attempt to shove prisoner's head into wall sufficiently states a claim of excessive force); *Cox v. Fischer*, 248 F. Supp. 3d 471, 481 (S.D.N.Y. 2017) ("[A] juror could reasonably conclude that a punch to the jaw is not a routine exercise of force, but rather one that may result in serious and lasting physical injury."); *Thomas v. Stalter*, 20 F.3d 298, 302 (7th Cir. 1994) (single unprovoked punch to the face objectively serious); *Wright v. Gess*, No. 18-CV-03338-STV, 2019 WL 4464142, at *6 (D. Colo. Sept. 18, 2019) (single unwarranted shove to the ground sufficiently serious) *with Evans v. Balmer,* No. 13-CV-805(MAT), 2017 WL 1106939, at *6 (W.D.N.Y. Mar. 24, 2017) (single blow not objectively serious) (collecting cases); *Brandon v. Nazorovich*, No. 2:02CV343, 2009 WL 891873, at *9 (W.D. Pa. Mar. 31, 2009) (same); *Wicker v. Lawless*, 278 F. Supp. 3d

989, 1009 (S.D. Ohio 2017) (single shove which resulted in bump to head not objectively serious); *Neal v. Miller*, 778 F. Supp. 378, 383 (W.D. Mich. 1991) ("[F]ederal courts have routinely held that a single push, shove, punch, or blow by a prison guard simply does not rise to constitutional dimensions.") (collecting cases). Nevertheless, in light of the Fourth Circuit's clear guidance that meeting the objective component of an Eighth Amendment excessive force claim "is not a high bar" and requires only the "nontrivial" application of force, the undersigned gives the benefit of the doubt to Plaintiff's assertion, corroborated by the videotape evidence, that he was struck in the face by Adkins, and his claim that this blow left him with ringing in his ears. *Brooks*, 924 F.3d at 112. Accordingly, the undersigned **FINDS** that Plaintiff establishes a genuine issue of material fact as to whether Adkins used sufficiently serious force to satisfy the objective component of an Eighth Amendment excessive force claim and, thus, summary judgment is not proper on this ground.

### 2. Subjective Component

Unlike the objective component, the subjective component of an Eighth Amendment excessive force claim is "a demanding standard." *Brooks*, 924 F.3d at 112. To establish that a correctional officer's actions violated the subjective component, a plaintiff must show that they acted with a "sufficiently culpable state of mind." *Iko*, 535 F.3d at 239. Specifically, "'wantonness in the infliction of pain.'" *Brooks*, 924 F.3d at 112 (quoting *Iko*, 535 F.3d at 239). The question of whether an action demonstrates this wantonness in state of mind "ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 113 (quoting *Whitley*, 475 U.S. at 320).

The Fourth Circuit has identified the following four nonexclusive factors to be

considered when analyzing the subjective component of an excessive force claim:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response.

*Iko*, 535 F.3d at 239 (quoting *Whitley*, 475 U.S. at 321). Here, Plaintiff complains of an avowedly unprovoked assault by Adkins in which Adkins struck him in the face. (ECF No. 2 at 4). Plaintiff also describes a second encounter with Adkins wherein he grabbed her arm and shoulder to prevent a second attack. (*Id.*). The videotape does reveal two encounters between Adkins and Plaintiff which loosely conform to Plaintiff's description of events. In the first encounter, beginning at 9:58:00, Plaintiff walks over to Adkins and stands extremely close to her while engaging in what appears to be an argument with her. Plaintiff confirmed at the status conference that he got in an argument with Adkins over what he perceived as an inconsistent application of jail policies. The view of Adkins is somewhat obstructed during this encounter due to the placement of the cameras. At 9:58:04, Plaintiff draws his hand back and then moves it forward quickly in Adkins's direction. Due to the position and quality of the view afforded by the videotape frames, it is not clear if this apparent attempt to strike Adkins actually made contact. The videotape clearly shows Adkins responding to Plaintiff's movement by slapping him on the left side of his head at 9:58:05. After the blow, Plaintiff steps back, and Adkins does not employ any additional force.

Plaintiff describes the second encounter as consisting of his attempt to stop Adkins from striking him again. (ECF No. 2 at 4). On the videotape, Plaintiff confront Adkins a second time beginning at 9:58:49, when Plaintiff turns suddenly and lunges toward Adkins, grabbing her by the arm. The two grapple together for several seconds

until two inmates intervene and restrain Plaintiff at 10:00:00. Contrary to Plaintiff's assertions, the videotape does not show any attempt by Adkins to strike Plaintiff prior to his sudden lunge in her direction.

Adkins in her motion for summary judgment focuses solely on the second encounter, commencing at 9:59:49, and argues that she is entitled to summary judgment because Plaintiff is the clear aggressor in the encounter and, contrary to Plaintiff's assertions, there is no observable punch prior to Plaintiff's attack. (ECF No. 23 at 4). While this is true, Plaintiff has made clear through his complaint and representations during the status conference that the centerpiece of his lawsuit is the blow Adkins delivered to his head in the first encounter. This encounter, then, is the one crucial to Plaintiff's complaint. If Adkins's actions during this encounter constituted impermissibly excessive force, it would not be excused by Plaintiff's later actions in the second encounter.[3]

The videotape evidence of this first encounter, however, blatantly contradicts Plaintiff's version of events and demonstrates that Adkins's use of force did not violate the Eighth Amendment's ban on cruel and unusual punishment as a matter of law. In Plaintiff's telling of this encounter, the slap was entirely unprovoked and delivered to Plaintiff without provocation. (ECF No. 2 at 4). To the contrary, the video evidence makes clear that Adkins struck Plaintiff only after (1) he engaged in threatening behavior

---

[3] To the extent that Plaintiff does attempt to argue that Adkins's actions during this second confrontation constituted constitutionally excessive force, he is unable to do so. Plaintiff has not identified, and the videotape does not reveal, any injury, even *de minimis* injury, stemming from this encounter during which Adkins and Plaintiff briefly grapple. Additionally, as stated by Adkins, Plaintiff is the clear aggressor in this encounter, turning abruptly toward Adkins and lunging toward her before she begins to move. Accordingly, any argument that the minimal amount of force Adkins deployed during this encounter was excessive would fail as Adkins was clearly not deploying force in a wanton manner, but in a good-faith effort to defend herself.

by standing in extreme proximity to Adkins while she was backed into a corner and surrounded by other inmates and (2) he hit or attempted to hit her. Plaintiff committed an unambiguously threatening movement by drawing his hand back with the apparent intent to hit Adkins. Even viewing the videotape in the light most favorable to Plaintiff, it is clear that Adkins's slap was "applied in a good-faith effort to maintain or restore discipline" and not "maliciously and sadistically to cause harm." *Wilkins*, 559 U.S. at 37 (quotation omitted).

"'When evaluating evidence to determine whether it is legally sufficient to satisfy the subjective component, a court may allow an inmate's claim to go to the jury only if it concludes that the evidence, viewed in a light most favorable to the claimant, will support a reliable inference of wantonness in the infliction of pain.'" *Thompson v. Shelton*, 541 F. App'x 247, 249 (4th Cir. 2013) (quoting *Stanley v. Hejirika*, 134 F.3d 629, 634 (4th Cir.1998)) (*per curiam*). Here, in considering the factors identified by the Fourth Circuit, it is evident that Plaintiff would not be able to succeed as a matter of law based on the uncontroverted videotape evidence.

The first factor, the need for the application of force, does not weigh in Plaintiff's favor. *Iko*, 535 F.3d at 239 (citing *Whitley*, 475 U.S. at 321). When Adkins delivered the blow that is the basis of Plaintiff's complaint, Plaintiff was, by his own admission, engaged in a confrontation with Adkins. The videotape reveals that Plaintiff was standing extremely closely to Adkins and gesticulating while Adkins was backed into a corner. Plaintiff then, at minimum, moved his arm in a threatening manner in Adkins's direction. Courts in this Circuit have routinely held that law enforcement and correctional officers may deploy force in response to threatening, disruptive, or assaultive behavior. *See Allen v. Anderson,* No. 5:13-CT-3238-FL, 2017 WL 4126345, at

26

*10 (E.D.N.C. Sept. 18, 2017), *order corrected on denial of reconsideration*, No. 5:13-CT-3238-FL, 2018 WL 1542232 (E.D.N.C. Mar. 29, 2018), *aff'd*, 736 F. App'x 416 (4th Cir. 2018) (deployment of pepper spray justified to forestall threat of assault); *see also Washington v. Lambert*, No. 3:12-CV-292-RJC, 2014 WL 4667078, at *5 (W.D.N.C. Sept. 18, 2014) (use of force appropriate when prisoner refused to obey orders, and lunged threateningly toward correctional officer); *Wood v. Rubenstein*, No. 5:12CV174, 2014 WL 6977624, at *6 (N.D.W. Va. Dec. 9, 2014) (correctional officers actions in shoving plaintiff against wall and pushing to ground were justified by plaintiff's attempts to remove cuffs and pull away during escort); *Adkins v. McDonald*, No. 5:14-CT-3169-F, 2016 WL 7655775, at *4 (E.D.N.C. Feb. 23, 2016), *aff'd*, 667 F. App'x 395 (4th Cir. 2016) (baton strike justified where plaintiff disobeyed orders, insulted guards, and grabbed correctional officer's wrist); *Short v. Walls*, No. 07–00531, 2009 WL 914085, at *9 (S.D.W.Va. Mar. 31, 2009) ("The administration of a beating for purposes other than to restore or maintain prison security or the plaintiff's own safety violates clearly established law."); *Gorham v. Massey*, No. 5:10-CT-3058-FL, 2012 WL 828153, at *7 (E.D.N.C. Mar. 9, 2012) (use of force was proportional where plaintiff was acting in a "disruptive manner" and disobeying direct orders). The need for the application of force when an inmate is engaged in disruptive behavior and initiates a threatening physical gesture is clear. The first factor thus weighs against Plaintiff.

The second factor asks a court to consider "the relationship between the need and the amount of force that was used." *Iko*, 535 F.3d at 239. This factor also decisively weighs against Plaintiff. "When force is needed to keep order, correctional officers may have little time for considered reflection and must quickly and decisively balance the need to maintain order and restore discipline through force against the risk of injury to

inmates." *Wheeler v. Fritz*, No. CIV.A. RBD-14-2727, 2015 WL 4485436, at *10 (D. Md. July 20, 2015) (citing *Hudson*, 503 U.S. at 6). In this case, the confrontation between Plaintiff and Adkins escalated quickly. Plaintiff first engages Adkins by striding into the red-cordoned area at 9:58:00 and within four seconds, at 9:58:04, he makes a threatening movement. Under these circumstances, facing what appeared to be an imminent threat to her safety, Adkins's response was proportional to the threat presented. Adkins did not deploy more force than was necessary to avert the threat presented by Plaintiff and did not continue to deploy force after Plaintiff ceased presenting an imminent threat. A brief deployment of force in response to disruptive and threatening behavior does not rise to the level of wanton infliction of pain that is required to establish a violation of the Eighth Amendment. *See e.g. Duncan v. McKenzie*, No. CV GLR-15-736, 2016 WL 1597103, at *6 (D. Md. Apr. 20, 2016), *aff'd*, 670 F. App'x 119 (4th Cir. 2016) ("Force is applied in a good faith effort to restore order and discipline when a corrections officer administers a single burst of pepper spray after a verbal confrontation initiated by an inmate.") (citing *Trusell v. Bailey*, No. 5:09CV101-RJC, 2011 WL 972571, at *7 (W.D.N.C. Mar. 15, 2011)).

The third factor, "the extent of any reasonably perceived threat that the application of force was intended to quell," likewise favors Adkins. *Iko*, 535 F.3d at 239. As noted, Adkins reasonably perceived that Plaintiff presented an imminent threat to her safety when he began arguing with her and made an unambiguously threatening movement. Correctional officers are certainly justified in deploying force in response to the threat of physical harm. Accordingly, the third factor is not in Plaintiff's favor.

Finally, the fourth factor, which considers any efforts made to temper the severity of the force employed, also suggests that Adkins's conduct was "a good-faith effort to

maintain or restore discipline." *Wilkins*, 559 U.S. at 37. Adkins deployed a single punch to Plaintiff after he made a threatening movement in her direction. She did not continue to strike him after he ceased to present a threat and did not deploy more force than was necessary to protect herself from the reasonably perceived threat. The use of force was clearly not wanton or employed with the intention of causing pain rather than in pursuit of valid penological goals, namely the need for correctional officers to ensure their own safety in a frequently dangerous environment. *See, e.g., Graham v. Connor*, 490 U.S. 386, 396-97 (1989) ("[P]olice officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation" and holding that courts must take that circumstance into account when considering whether a constitutional violation occurred); *Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999) (holding that when "dealing with … agitated detainees prison officials must not be forced to walk a tightrope" and be subjected to unforgiving after-the-fact scrutiny); *Medrano Ortiz v. Solomon*, No. 5:15-CT-3251-FL, 2019 WL 1245779, at *9 (E.D.N.C. Mar. 18, 2019), *aff'd*, 778 F. App'x 236 (4th Cir. 2019) ( finding that "in light of the deference prison officials should be afforded in tense, uncertain situations" correctional officers decision to "slam" inmate into ground in response to inmate's refusal to follow order was not excessive). Accordingly, none of the factors support a claim for excessive force under the Eighth Amendment.

In summation, the uncontroverted videotape evidence shows that Plaintiff engaged in threatening behavior and Adkins responded to that behavior proportionally. It would not be reasonable for a jury to conclude that Adkins's actions in delivering a single strike to Plaintiff's head in response to his threatening movements was inflicted

for the purpose of causing pain rather than in a good-faith effort to restore order. Accordingly, the undersigned **FINDS** that, as the undisputed videotape evidence conclusively establishes that Adkins did not use excessive force, Plaintiff is unable to state a claim against this Defendant, and summary judgment is appropriate on this ground.

## V.    <u>Proposal and Recommendations</u>

For the reasons set forth above, the undersigned respectfully **PROPOSES** that the United States District Judge accept and adopt the findings herein and **RECOMMENDS** that the presiding District Judge **GRANT** Defendant's Motion for Summary Judgment, (ECF No. 22); **DISMISS** the complaint against Adkins with prejudice, (ECF No. 2); and **REMOVE** this Defendant from the style of the civil action.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S.

140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to Judge Chambers, Magistrate Judge Eifert, counsel of record, and any unrepresented party.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Plaintiff and counsel of record.

**FILED:** January 9, 2020

Cheryl A. Eifert
United States Magistrate Judge

31